Yes, thank you. Good morning, this is Michael Delangelo. May it please the Court, when viewed in context, the evidence... Can I ask a preliminary question? Can I ask the pre-preliminary to raise the, so I can hear you, so I can hear the preliminary question? Thank you. Is this better? Yes. Thank you. My preliminary question is, it was unclear as to the impact of the bankruptcy. I mean, there is some discussion in the motion, and the other side cited one of our decisions suspending the appeal. What happens in this case? Well, in this, the bankruptcy is significant as it relates to the Sienta allegations. No, I'm not asking... Right, to the extent... I'm just, do we need to suspend this appeal, or do we go forward as to the individuals, or do we go forward as to the whole thing? That's what my question is, procedurally. Thank you. Procedurally, it should be stayed as to the entity. However, as to the individuals, there is no reason to stay, because they have not declared bankruptcy. There are numerous authorities that we've cited that indicate... Well, there is a principle of if it's intertwined, or I forget the exact wording, then it should... But you agree that we cannot affirm or vacate and remand as to the company? Yes, I do. Okay. Thanks. I think Judge Chin was trying to be sure we're not contempt of court. I think that... I mean, you too, huh? I think Judge Chin was trying to make sure that we were not in contempt of court by holding this hearing. Thank you, and likewise, I was not attempting to be in contempt of court either, to the extent that there was... I thought in our papers and our motion cover, we made clear that it was the appeal, or the remand motion, and I guess to the extent that the appeal continues is really only as to the individuals and not the entity. Let me just follow up, because you were going to mention that it relates to Sienter, but we've said over and over again that on the issue of motive, that simply something that would be shared by all corporate insiders, a motive that would be shared by all corporate insiders is insufficient to demonstrate Sienter. So whether you want to characterize it as a desire to avoid the company going to bankruptcy or keeping the stock price up for an IPO, which are, I think, both arguments that you make, why hasn't our case said that that share by every corporate insider doesn't want the company to go bankrupt or doesn't want the stock to go down? And you don't have any evidence that they sold shares or exercised options. So can you really proceed on a motive theory under those circumstances? I believe we can for two reasons. With respect to sort of so generally, what a lot of the cases that address the motive issue that the court has identified, and we agree when there are generalized, unlinked allegations regarding motive, like to maintain the stock price, avoid bankruptcy, those are general corporate objectives. However, here, and in certain cases that recognize the distinction, where it is clearly linked to the alleged fraud, and here there are a series of them, bankruptcy, avoiding bankruptcy, the IPO, around which there are numerous issues, the options, when they're linked and there is a distinction. And, you know, the defendants and the district court. I don't understand. They're always linked. Aren't they always linked? The fraud is always, not always, but almost in every situation trying to keep the stock price up, right? No, I apologize. So the distinction I'm trying to make is that the alleged misstatements are about a material weakness relating to the recognition of revenue for gift cards. And what we are arguing is that the link flows through to each thing, right? So the IPO could not happen because the IPO is of the entity that sells the gift cards. So if the material weakness were revealed and not concealed through Somani, then the IPO couldn't proceed. And as we've laid out in our papers, the company would inevitably go bankrupt. It's not a sort of generalized desire to keep the stock high. It's not a generalized desire to avoid bankruptcy that's somehow unlinked to the underlying misstatement. And, you know, Your Honor asked about options. So here there is an important factual issue, right? The options that Mr. Reyna had, $176 million in the money options on EBICS cash, which was the entity that EBICS was trying to bring public by an IPO, could only be exercised if the IPO was successful, right? So, you know, I think you have to view the motive in the context, right? The fraud is what made, what would make it possible. Let me ask you on the, assuming we disagree with that, and we're on the circumstantial evidence prong, their argument is that nothing that you point to is any evidence of their knowledge of anything with respect to internal controls prior to November, the 3Q, November 9, 2020. Everything you point to, the resignation of the auditor, putting in a new auditor, this prospectus in India is March 22, the Hindenburg Report, June 22. So why do those things provide strong evidence of scienter when they're all after the filing that you're claiming was a misstatement? Because they all flow from and inform the underlying misstatement, right? How does it show they knew at the time that if the auditor resigns in February of 21, how does that show that they knew there was an internal control problem in November of 20? How does it show that? So the auditor says that there's a material control weakness at least as early as of December 2020. The alleged misstatement is September of 2020. But one place that you can look is the clarification that comes as a result of the Hindenburg Report, right? So later on, Hindenburg issues this report. It says that we question the fact that the company sells gift cards to consumers because the company says it sells gift cards to corporations and consumers. And the company does two things. It attacks Hindenburg and says these allegations are outrageous and false. And then it also simultaneously issues a clarification saying, in fact, we don't sell gift cards to consumers. Okay, but that's in June of 22. They didn't say in their clarification, and we knew in 2020 that we didn't sell gift cards to consumers, right? Well, if I may, so what that clarification goes on to say in the press release is that our EBICS's contracts with corporations preclude us from selling to consumers. And the material weakness in internal controls goes to these gift card sales where the company is saying, in effect, we sell them through two channels, right? RSM, the auditor, quits saying there's a material weakness. And any properly designed— But they say that was the material. As to the gift cards, recognition of revenue for the gift cards. No, but you have a CEO. They acquire this company in India. How would a CEO necessarily know whether they're selling to consumers, whether that's correct or incorrect? Why would a CEO know that detail? For several reasons. They'd owned the company for a long time. The gift card EBICS cash, the company that sold the gift cards, was 62% of the revenue for the parent. The CEO repeatedly, as we say in the complaint, talked about the gift card sales. It was the fastest-growing segment of EBICS cash. It was driving the stock price of EBICS through the roof, right, which is what we say the company was trying to capitalize on. And the CEO certifies the internal controls along with the CFO. So that's how he would know. He's repeatedly out there touting these gift cards. The clarification acknowledges that they weren't actually allowed to sell to consumers. He certified— Wait, wait, wait. Selling the gift cards and selling them to consumers may be different things, no? Pardon? Sorry. Selling gift cards and selling them to consumers may be a different thing. You can be selling the gift cards but not selling them to consumers, selling them to wholesale. That's correct. There are two different sales channels. No, but everything you just said could all be someone who doesn't know the details of who it's being sold to but thinks it's a profitable business overall, right? Just because someone is touting that, it's not as if they weren't selling gift cards at all, as to Judge Sachs' point. It was just what channel. But someone could be making statements that this is a profitable business without knowing that detail. Well, the profitability is not the issue, really. What he's saying is that we're selling this massive amount of gift cards, which is driving the stock price up. He's saying I'm responsible for the internal control that governs the accounting on how these are sold, and they're sold through two channels. When the company is called on it, they say, oh, in fact, let's clarify. We don't actually—this other sales channel doesn't exist. A properly designed internal control would readily recognize that the other sales channel doesn't exist. All right. Thank you. And we'll hear from Mr. Gardner. You have three minutes in rebuttal, Mr. Dan. Thank you. Good morning, Your Honors. May it please the Court. Cliff Gardner at Skadden Arbs for the FLEs. Speaking only to the individual defendants today in light of the bankruptcy stay, I think, Your Honor, put your finger on the argument to plead scienter for a securities fraud case requires motive and opportunity first. There's not any allegation of any stock sale, any exercise of options, no concrete personal benefit received by either individual at any point in time. That distinguishes this case from virtually every case cited by the appellant. If unable to identify any concrete personal benefit, the motive allegations are extraordinarily weak and, as Judge Furman recognized. We then proceed to the question of whether, absent motive and opportunity, scienter could be shown by demonstrating the individuals were in possession of contrary information at the time the challenge statements were made. Those challenge statements were made as of September 30, 2020, the first time in the allegations that these individuals had any reason to suspect, according to the complaint, any doubt about the internal controls as February 15, 2021, when RSM resigns, having commenced an audit in November, which is after September 30, 2020, and saying they found the potential material. So that's only a few months later, right? After statements November 9, 2020. Isn't that some evidence that they didn't have those controls back in the third quarter? Well, it's certainly after the fact evidence. It's after the fact evidence, but is it? I mean, if someone said we didn't have those controls back then, that would still be after the fact evidence, but it would be some evidence that they didn't exist back then. So why isn't this some evidence? Well, I think two reasons, and Judge Furman identified both of these in his opinion. I think first is the allegation is that audit that uncovers it doesn't commence until November. These challenge statements as of September 30, 2020, the audit commences thereafter. So to the extent the auditors actually found that evidence, it is after the fact, and it makes it impossible for it to be the case that the auditors brought any control issue to the individual's attention at the time they made the challenge statement, which is required to demonstrate scienter. So you're not arguing that the internal controls weren't lacking during this earlier time frame. In other words, Judge Simpson's point, I think, is well taken, that they didn't happen overnight. The internal controls may have been lacking for a long period of time, but you're suggesting that there was no knowledge of that, correct? Correct. The point I'm making is all of this evidence that the appellant brings goes to the falsity at best, not to scienter. And, Your Honor, again, we have to do a balancing test here. Number one, we have to identify a contrary fact known to these individuals at the time contemporaneously. That doesn't exist. And just adding up more and more evidence of potential falsity will never get us to scienter. Well, Mr. D'Angelo's, I think, fundamental point that he was making towards the end is that this was such a core aspect of this business, such a big deal about whether or not these cards were being sold to consumers, that even though they're not relying on that as an independent falsity, that they must have known that the controls were lacking if that was a false statement. What's your response to that? Well, I think it is exactly what you said, that it must have known. And that is a theory that has been rejected time and again. The gift card statement is there. Well, there's one little twist to that is that the statement is the CEO and the CFO evaluated the controls and procedures. So the statement is they looked. And so if the controls weren't there, then they should have known if they represented that they looked. Why isn't that some evidence of Santa, arguably? Well, it's not for multiple reasons. They looked to look at the controls over the financial accounting. The challenge statement is about who these gift cards are sold to. It is four words, corporate, client. Well, no, that's the second statement. But I was focusing still on the first set. You know, these disclosure controls and procedures are effective. In other words, if they said we looked and evaluated the effectiveness and concluded that they were effective, and if, in fact, the controls weren't there, I suppose it certainly goes to falsity. But why isn't that some evidence of Santa? Well, because merely stating that I looked at our accounting controls and I have not found any, and they are effective, isn't the same thing as saying I know those controls not to be effective and I'm lying to you about it now, which is the critical aspect here. The gift card point that appellants make, which is made, I think, at one page of their brief below, but now it seems to be center stage, the clarification comes multiple years later in 2022, and it's a clarifying four words in the September 30th, as of September 30th, 2020, that stated the gift cards are sold to corporate clients and consumers. I think it's a reasonable reading that corporate applies to both. But when this comes to light in 2022, the company immediately corrects, clarifies it, and expands those four words to multiple paragraphs to make it clear. There's no financial restatement that comes along with it. There's no restatement of the accounting of these revenues, which I think is critical to go to the Santa point. And one point I want to make, because we do balance the inferences that Plaintiff seeks you to draw as to Cienter, against the other cogent explanations here. And I want to put in context, again, this disclosure in September 30th, 2020, as of September 30th, 2020, comes in the middle of the COVID-19 pandemic. The plaintiffs allege that during the pandemic, all of EBICS's non-essential workforce is working at home. They allege that this gift card sales rose 268% quarter over quarter through COVID, because of the desire to get non-physical currency in India. And so I think when you put all of this together, and again, accountant doesn't raise any issue until after the challenge statements. I think the far more logical and compelling read here is that, most charitably, at some point during the pandemic, with staff at home and sales of this product skyrocketing, that the accounting got away from the company at some point. That sounds in mismanagement at best, or negligence, but not Cienter, which is required to plead the claim. The last thing I'd like to point out in my time, Your Honor, is we heard the argument today and in the papers repeatedly, that one could have motive and opportunity with these generic goals that all corporate insiders share, higher stock price, avoiding bankruptcy. The law of this circuit is quite to the contrary, in both South Street Cherry, in the Novak case, as well as the Mayland VXL Capital, not one single sale. And I'd also like to note that the suggestion in the reply brief, that one could have motive and opportunity without actually profiting, they cite two cases, the Purdue case and the Reserve Fund case. Those cases don't contradict that point, that motives shared by all insiders aren't sufficient. In the Purdue case, the defendants are alleged to have profited $70 million from the scheme. And in the Reserve Fund case, the defendants were allegedly motivated to maintain lucrative management fees, very idiosyncratic fees. And so we are again left at this point where Your Honor, Bianco began, which is these are motive allegations that are shared by every corporate insider. Reading this complaint as charitable as we can, it sounds only in mismanagement and fraud in hindsight. Again, September 30th, 2020 is a challenge statement, and all of the circumstantial evidence that is alleged comes subsequent to that statement. Could I just go back to my preliminary question for a moment? Yes. Whether we vacate or we affirm would only be as to the two individuals, and the appeal remains pending as to the company until further word from the bankruptcy court? Is that what we should be doing? Well, so we make this point in responding to the motion that was made, is that here it's absolutely true an automatic stay applies to EBICS. The scienter allegations here, the appellant argues, should be imputed to the company. I don't understand how, as intertwined as those are, one could make any ruling as to the individuals without implicating the company. But I will recognize that. But you're not asking for us to suspend proceedings. You want us to go ahead and affirm as to the two individuals? But what happens to the appeal as to the company is, I guess, my technical question. I think it's an excellent technical question. I recognize that I have not made a motion for a stay, and there is not one made in the bankruptcy action. If you go forward. It's an automatic stay? It is an automatic stay. I'm sorry. I should be more precise. No motion to extend that automatic stay on to the individuals. If you were to affirm as to the individuals, I think that forecloses the claims against EBICS itself, and I think the opposite must be true, too, which means that they do. But we don't have to decide that? We don't have to decide what you're just saying. No, you don't. To affirm Judge Furman's opinion, you don't have to decide that, no. If we were to reverse, though, you suggested we reverse, then we could be creating an issue because that could be suggesting some liability for the company, right? As this case is argued, yes. If you were to reverse, the argument is the individuals imputed to the company. So you're suggesting it depends on what the decision of the court is as to whether or not we could potentially be impacting the company, the bankruptcy stay? It does appear that way, yes. All right. Thank you. Thank you for your time. Mr. DelAngelo, you have three minutes. Thank you. I'd just like to address two things that were said that may lead to some misunderstanding. I may have misunderstood my colleague at the bar, but I just would like to be clear about something. I think one of the first statements my colleague at the bar here made was that the company didn't have any reason to suspect that there was an issue with the audit until the audit began and that that was according to the complaint. I do not believe that. Could you speak up a little bit? I believe what was said in the response was that the fact that the company did not have a reason to believe that there was an issue with the internal control until the audit began was, quote, according to the complaint, and I do not believe that that's what we allege in the complaint. I know, but you've had discovery now, so the question is, is there any evidence? You know, you would think that a CEO can rely on the auditor to determine whether or not there's internal controls that are sufficient, right? Well, there has been no discovery. The PSLRA imposes a stay on discovery. Okay. And so that, the State does not lift. Where do you allege that they knew, the auditors told them before September 30th, then? We don't. That's not the issue. The issue, what we're alleging is that the individual defendants, Reyna and Hamill, designed the internal control and affirmed it, and that they were aware that there was a material weakness. The issue that I was responding to is a statement in the response that said, according to the complaint, they had no reason to suspect until the audit was performed. That's just what I was trying to confirm. And then separately, in addition, there's another statement toward the end, that characterizing the misstatement in the complaint as the sales channel or to whom the gift cards were sold, corporate or consumers, that is not the misstatement we are alleging. We are simply alleging that the misstatement is that the internal control was effective. What we go on to say is that the clarification is strong evidence that the defendants knew, the individual defendants knew at the time that the internal control was not effective because any properly designed internal control would detect that your largest and fastest growing segment had a nonexistent sales channel. With respect to the discussion about the evidence arising after, I think it is common for evidence to follow after the fraud, essentially what the district court was demanding was some evidence at the time. But what you have here are some bookends. Before the alleged misstatement, you have a company that has been accused of audit shopping, has been questioned by the SEC for potential fraud, was involved in another securities fraud case. You have the alleged misstatement, and then within months, the public disclosure that there was in fact an internal control failure and a wealth of evidence that follows that affirms that there is a very strong reason to make the misstatement about the internal control. And that circles back to the point that the defendants, you know, having designed the internal control over the fastest growing and most important segment of the business, knew at the time that they made the statement and at the time that they designed the internal control that it was ineffective.